**UNITED STATES of America**
**v.**
**Carolyn S. McDANIELS et al.***
**Crim. No. 72–330.**

United States District Court,
E. D. Louisiana.

Nov. 6, 1973.

---

* Consolidated with: U. S. v. Gladys Fascio, Cr. 72–331; U. S. v. Deola R. Richardson (two cases), Cr. 72–332, 334; U. S. v. Eartha St. Ann, Cr. 72–333; U. S. Audrey Lee Delair, Cr. 72–335; U. S. v. Maxine Smith, Cr. 72–336; U. S. v. Wilhemenia Brown, Cr. 72–337; U. S. v. Lorchid Goff, Cr. 72–338; U. S. v. Evelyna Bannister, Cr. 72–339; U. S. v. Diane Evans, Cr. 72–340; U. S. v. Ella Rita Sanchez, Cr. 72–342.

Robert Livingston, Asst. U. S. Atty., for the United States.

Richard B. Sobol, Washington, D. C., for defendants in Crim. Nos. 72–330, 72–332, 72–333, 72–334, 72–335, 72–337, 72–338, 72–340 and 72–342 and for the defendants other than Althea Oates in Crim. No. 72–331.

Louis A. Gerdes, Jr., New Orleans, La., for Althea Oates.

Charles C. Garretson, New Orleans, La., for Anna Jones Perkins.

Joseph A. Barreca, New Orleans, La., for Christine Walker.

Nils R. Douglas, New Orleans, La., for Lorchid Goff.

ALVIN B. RUBIN, District Judge:

The motion to dismiss and to suppress raises issues concerning the procedure to be followed under the Social Security Act when state authorities suspect fraudulent practices by recipients of public assistance.

## I.

Louisiana's welfare department officials, it is contended, violated both federal and state regulations in the present case; it is urged that the indictments must be dismissed because possible fraud was not sufficiently investigated and there was never a referral for prosecution made by the officer designated for that purpose, or by any other responsible official. It is also contended that collateral contacts are prohibited in cases of suspected fraud as well as in eligibility determinations, and that the making of outside contacts by state welfare agency personnel in investigating possible fraud in these cases requires suppression of the evidence thereby obtained.

It is apparent that the premises on which these motions rest are inconsistent. The thrust of one is that a state welfare officer must review evidence carefully, and decide virtually to recommend criminal prosecution before referring the case to a law enforcement officer. The thesis of the other is that no evidence with respect to suspected fraud may be gathered from outside sources without the welfare recipient's consent. But federal regulations requiring anomalous approaches are not unprecedented, so we must examine the statute and the regulations to determine whether they embody either, or both, of these proscriptions.

## II.

Anonymous informer's tips and other suggestions aroused suspicions by officers in Louisiana's Department of Public Welfare that some recipients of Aid to Dependent Children (ADC) might be receiving aid fraudulently. An extensive inquiry was begun by the agency's chief investigator. He examined applications for suspected fraud. He tried to locate other recipients who might be connected with the suspected fraud by comparing various applications for similarity in handwriting, by seeking duplications in names and addresses, and by attempting to locate any information that might indicate deceptive practices. He also interviewed neighbors of some recipients and other outside persons for information concerning the identity of persons who had cashed checks.

In some instances, he appears to have followed what he considered a connecting thread from the file of a person suspected of fraud to the file of another person without more to justify the search than some connection thought to exist between the suspected recipient and another recipient. Thus, in instances where an application, believed to be fraudulent, listed another person as the applicant's authorized representative, investigation of the authorized representative was undertaken. This was done in the cases of Thelma Jones and

Brenda Cryer. The investigation disclosed evidence later used as a basis for indictment of these two defendants. In the case of Diane Evans, the thread was the request of another recipient that checks believed to have been obtained fraudulently be mailed to Mrs. Evans.

When, after months of investigation, incriminating data with respect to all of the present defendants was assembled, Louisiana's Director of the State Welfare Department and the head of the department's Recovery Unit decided to deliver the information that had been developed together with the files of the persons thought to be involved to federal postal authorities and to seek their assistance. There was no "referral for prosecution."

### III.

The ADC program,[1] governed by regulations adopted pursuant to general statutory authority, requires each state to establish methods and criteria for identifying situations in which a question of fraud in the program may exist,[2] and "procedures developed in cooperation with the state's legal authorities for referring to law enforcement officials situations in which there is valid reason to suspect that fraud has been practiced."[3] It requires the state welfare agency to designate an official who will be responsible "for referral of situations involving suspected fraud to the proper authorities."[4] These provisions are in a part of the regulations entitled "Fiscal Administration of Financial Assistance Programs."

 Another part of the regulations, dealing with eligibility determination, prohibits a state agency from taking any steps "in the exploration of eligibility" without prior consent of the appli-

cant or recipient.[5] This "collateral contacts" rule is designed to prevent "practices that violate the individual's privacy or personal dignity, or harass him or violate his constitutional rights."[6]

The "collateral contacts" prohibition is found only in the eligibility determination part of the regulations. The text of the prohibition is limited to eligibility determination for it provides, "The agency takes no steps *in the exploration of eligibility* to which the applicant or recipient does not agree." (Emphasis supplied.)[7]

Nor can the scope of this rule be expanded on the theory that it is not the business of the agency to prepare evidence. While the agency is not a prosecutor, it has, as the regulations elsewhere make clear, specific duties to perform before referring cases for prosecution.

 A rule that forbade the agency to make any outside inquiry when fraud was suspected before referring the case to a prosecutor would impose potential hardship on aid recipients for it would expose them immediately to criminal investigation on unfounded rumor, mere conjecture, or innocent error. That the state agency is not made a public prosecutor does not mean that it must in mechanical fashion thrust the file of any recipient with respect to whom suspicion of fraud is remotely aroused into the hands of a U.S. Attorney or a state district attorney. That prosecution is the responsibility of law enforcement officials and the courts[8] does not mean that all suspicions must be put instanter into the criminal justice process. In their memorandum in support of the motion defendants cite three cases dealing with the NOLEO provision of the Social Se-

---

1. This is included in the Social Security Act, 42 U.S.C. § 601.

2. 42 C.F.R. § 235.110(a). 42 C.F.R. § 235.110(a)(2).

3. Ibid.

4. 45 C.F.R. § 235.110(c).

5. 45 C.F.R. § 206.10(a)(12)(a). This HEW "collateral contacts" regulation has since been deleted, 38 Fed.Reg. 22009 (1973).

6. 45 C.F.R. § 206.10(a)(10).

7. 45 C.F.R. § 206.10(a)(12)(a).

8. Handbook of Public Assistance Administration, § IV, 2634.

curity Act,[9] 42 U.S.C. § 602(a)(11), by way of illustrating the separation of public assistance and law enforcement functions. Taylor v. Martin, N.D.Cal. 1971, 330 F.Supp. 85; Meyers v. Juras, D.Or.1971, 327 F.Supp. 759; Doe v. Shapiro, D.Conn.1969, 302 F.Supp. 761. The courts held in those cases that a threat to terminate payments unless welfare recipients agreed to requirements not properly imposed by state officials presented an additional eligibility requirement on recipients not demanded by the Act; hence it could not stand. These authorities do indeed reflect the principle that the welfare agency's function is the provision of public assistance, not enforcement of the criminal non-support laws. But the present cases involve no effort by state officials to exact requirements of welfare recipients in the interest of general law enforcement. The state officials here were engaged in performing a function required of them by the regulations. Nor can it be shown here, as it was in the cited cases, that there was administrative overzealousness.

The suggestion was made at oral argument that the regulations be considered to require the department to ask the recipient of aid for permission to make collateral contacts in every case of suspected fraud; if permission were denied the department would then recommend prosecution. This is not a tenable reading of the regulation, which draws no such distinction. The adoption of such an interpretation would violate the regulation implicitly forbidding referral for prosecution unless there is "valid reason to suspect that fraud has been practiced." (See note 3, supra, and Section IV below.) It would perhaps unconstitutionally equate silence with guilt.

There is a workable distinction between a question of eligibility and suspi-cion of fraud. Many eligibility determinations can be made from the face of the application, from examination of supporting documents and the agency's file, and by interviewing the applicant or recipient. The fact that once fraud is discovered the information may be used to deny eligibility does not mean that every eligibility investigation is a fraud investigation. This superficial reasoning is a classical illustration of the false syllogism. That all males are human does not mean that all humans are males. Neither does the fact that all fraudulent recipients of aid are ineligible mean that all ineligibility investigations involve fraud.

## IV.

The HEW Regulation with respect to suspected fraud contemplates some preliminary investigation by the agency before a case is turned over to a law enforcement officer. Each state plan must provide methods and criteria for identifying situations in which a question of fraud may exist.[10] That procedures must be developed for referral to law enforcement officers of "situations in which *there is valid reason to suspect* that fraud has been practiced"[11] implies that cases where "valid reason" does not exist will *not* be referred. This conclusion is buttressed by the express provision that the state agency plan (not its law enforcement program) must provide "For methods of investigation of situations in which there is a question of fraud . . . ."[12]

The HEW regulations deal specifically only with questions of fraud that are to be determined in accordance with state law.[13] But we may assume that the same policy would apply, and the same procedure should be followed, before a case is referred to federal authorities.

The HEW regulations also require the state agency to designate the official re-

---

9.* This provision requires prompt notification to law enforcement officials by a state agency of desertion or abandonment by a parent of a child who is a recipient of ADC.

10. 45 C.F.R. § 235.110(a)(1).

11. Emphasis supplied. 45 C.F.R. § 235.-110(a)(2).

12. 45 C.F.R. § 235.110(b).

13. 45 C.F.R. § 235.110(a).

sponsible for referral of situations involving suspected fraud to the proper authorities.[14] The purpose of this requirement is to assure that such cases are given adequate consideration and that the responsibility of the agency and the rights of the individual are preserved.[15]

The state agency investigation of the present cases was discreet and considerate. No claim is made that any constitutional or statutory right of any recipient of aid was violated. The sole irregularities complained of are those discussed in this opinion. Finally, a decision to ask federal authorities to investigate these matters was made by a responsible state official.

■ It is contended that the state authorities lacked power to seek further investigation and could only refer the cases for prosecution; in addition it is implied that this decision should have been made by the State Division of Legal Services, as provided in the Louisiana State Welfare Manual. But the regulation does not forbid state officials to solicit investigative assistance from the postal authorities, and require them either to refer a case for prosecution or drop it. The less militant approach taken by state officials in these cases indicates a solicitude for protecting recipients from precipitate criminal charges in full accord with the humanitarian purpose of both statute and regulations. The decision was made by a responsible agency official. No prejudice is shown by the fact that it was not made by a Division of Legal Services.

For the reasons given the motions to dismiss and to suppress must be denied, without need to reach the final question whether, if violation of the regulations had been proved, the relief sought would be appropriate.

V.

The evidentiary hearing revealed that the complete case files of those recipients subsequently indicted for mail fraud were turned over by the state agency to the United States postal inspectors. There was apparently no effort to screen out and keep confidential those portions of the case records that were unrelated to the fraud charges.

Section 402(a)(9) of the Social Security Act, 42 U.S.C. § 602(a)(9), requires the states to "provide safeguards which restrict the use or disclosure of information concerning applicants and recipients to purposes directly connected with the administration of aid to families with dependent children." HEW regulations require the states to impose by statute legal sanctions for violation of the confidentiality requirement.[16] The regulations specifically state that the policies must be applied "to requests for information from a governmental authority, the courts or a law enforcement official."[17] Louisiana has adopted this policy by statute,[18] and has adopted a series of implementing regulations.[19]

HEW's position, as expressed in a statement prepared for the Senate Finance Committee, is that disclosure for purposes of prosecuting fraud is permissible, so long as the information disclosed does not go beyond what is pertinent to the question of fraud itself: "Disclosure of information unrelated to the suspected fraudulent conduct is, of course, both unnecessary and undesirable, and the welfare agency therefore has the responsibility to make available from case files only such information as is needed for the investigation of the fraudulent activity in question." Hearings, Sen. Committee on Finance, 92d Cong., 2d Sess., "Establishing Priorities Among Programs Aiding the Poor," pp. 145, 149 (Feb. 15, 1972).

14. 45 C.F.R. § 235.110(c).

15. HEW Handbook of Public Assistance Administration, § IV, 2634.

16. 45 C.F.R. § 205.50(a)(1).

17. 45 C.F.R. § 205.50(a)(2)(v).

18. La.R.S. 46:65.

19. La. Dept. of Public Welfare, State Manual, §§ 2–461 to 2–466.

Because of the violation of this regulation, the defendants seek to have the court order the government to prepare "a report describing what part of each file has been used in investigation of the fraud charges so that the part not so used could be discovered."

 But such a report would appear to serve no useful purpose. The court will consider a motion to require the return of the privileged part of each file to the state agency. At an appropriate time counsel for defendants may examine the retained part of each file turned over to federal authorities by the state to determine whether any further relief is warranted.

See also, D.C., 57 F.R.D. 171.

